IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MARYLEE ARRIGO,

                                               OPINION AND ORDER

                Plaintiff,

                                         12-cv-700-bbc

        v.

LINK STOP, INC., JAY E. LINK,
ASHLAND LAKE SUPERIOR LODGE, LLC,
GRANDMA LINK'S RESTAURANT AND LOUNGE, LLC
and GORDON PINES GOLF COURSE
d/b/a LINK INTERNATIONAL INVESTMENTS, LLC,

                Defendants.[1]

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

The Family and Medical Leave Act gives an employee the right to take 12 weeks of unpaid leave over the course of a year for certain medical reasons. 29 U.S.C. § 2612. In this case, plaintiff Marylee Arrigo contends that defendants Link Stop, Inc., Jay E. Link, Ashland Lake Superior Lodge, LLC, Grandma Link's Restaurant and Lounge, LLC and Gordon Pines Golf Course collectively qualify as her employer under the FMLA and violated her FMLA rights in various ways. In particular, she alleges that defendants delayed her return to work after she took medical leave in September 2010, changed her job after she returned, refused

---

[1] Plaintiff's complaint lists Gordon Pines and Link International as separate defendants. However, the parties have filed a stipulation in which they agree that Gordon Pines is doing business as Link International. Dkt. #85. I have amended the caption to reflect the stipulation.

a second request to take leave, disciplined her and then fired her in January 2011.

Four motions are before the court:  (1) plaintiff's motion for partial summary judgment, dkt. #63; (2) defendants' motion for summary judgment, dkt. #53; (3) defendants' motion for leave to file an amended answer to add a "good faith" defense, dkt. #107; and (4) defendants' unopposed motion for leave to file a reply brief in support of their motion for leave to file an amended answer.  Dkt. #122.

Plaintiff seeks summary judgment on the issue whether defendants had a sufficient number of employees to qualify as an "employer" under the FMLA during the time relevant to her claims.  I am granting this motion because it is undisputed that defendants qualified as an employer after November 2010 and I agree with plaintiff that, under the plain language of the FMLA, defendants may be sued for violations that occurred any time in 2010 or 2011.  I am denying defendants' motion for summary judgment because they have not met their burden under Fed. R. Civ. P. 56 to show that they are entitled to judgment as a matter of law on any of plaintiff's claims.  Finally, I am granting defendants' motion for leave to file a reply brief because it is unopposed and granting their motion for leave to file an amended answer because I see no unfair prejudice to plaintiff in allowing defendants to assert a good faith defense.

From the parties' proposed findings of fact and the record, I find that the following facts are undisputed.

## UNDISPUTED FACTS

### A. The Parties

At all times relevant to this case, defendant Jay Link owned four businesses in northwest Wisconsin: defendants  Link Stop, Inc., Ashland Lake Superior Lodge, LLC, Grandma Link's Restaurant and Lodge, LLC and Gordon Pines Golf Course.  In March 1999 plaintiff Marylee Arrigo began working for defendant Link Stop at a location that was a combination of a convenience store, a gas station and a restaurant.  After leaving in 2002 to attend school, plaintiff returned in 2003.  In 2004, she became the bookkeeper for Link Stop and then the general manager.  By 2010 plaintiff was doing bookkeeping for defendants Link Stop, Grandma Link's Restaurant, Gordon Pines Golf Course and Ashland Lake Superior Lodge.

### B. Plaintiff's First Request for Medical Leave and Return to Work

On September 10, 2010 plaintiff was hospitalized after she suffered from a severe panic attack that included symptoms such as vomiting, difficulty breathing and uncontrollable crying.  Her doctor diagnosed generalized anxiety disorder, prescribed medication and directed her to remain on medical leave for two weeks.  Plaintiff requested leave, which defendant Jay Link approved.  Plaintiff was paid during her leave.

On September 27, 2010, plaintiff received a release from her doctor to return to work without restrictions.  Plt.'s Dep., dkt. #39, at 229.  Plaintiff informed Link's assistant, Lydia Cook, that she had a doctor's release to return to work.  Cook told plaintiff that she should

3

talk to Link first because he wanted to "analyze" her before she returned to work.  When plaintiff asked Cook whether Link thought that plaintiff "went nuts," Cook stated, "That's pretty much what [Link] heard."  Plt.'s Dep., dkt. #39, at 230.

Plaintiff called Link, who was on a hunting trip at the time.  He prohibited plaintiff from returning to work until he came back from his trip in two weeks.  Link believed that it was his decision as plaintiff's employer whether to "bring her back and under what terms" because "it was [his] money."  Link Dep., dkt. #51, at 281-83  Because plaintiff "had an anxiety break up or attack," he did not believe that it was "unreasonable at all" to want to "sit down and talk with her face to face" before she returned to work.  Link Dep., dkt. #51, at 255.  He "wanted to make sure she was of sound mind, that she wasn't going to make a mistake, or if she was going to make a mistake, [he] could have somebody there overseeing her so we could catch it."  Id.  (The parties dispute whether Link said that plaintiff was "in no condition to discuss money" when she asked whether she would be paid for the additional leave time.)

On October 8, 2010, Link had a meeting with plaintiff to determine whether she could return to work.  Plaintiff told Link that she had been suffering from anxiety for one year; she was taking two medications for anxiety as well as a sleeping aid; her medication was working; she would be going to therapy every three weeks or as needed; and she felt fine now.  She repeated that her doctor had released her to work.

At the end of the meeting, Link decided that plaintiff could return to work on October 11.  However, he was relocating her office from Grandma Link's to Bond Lake,

4

where his own office was.  (The parties dispute what Link told plaintiff about the reasons for the move.  Defendants say that Link told her that the move would "allow her to focus more directly on her bookkeeping duties without the distractions that existed at the Link Stop" and would give her "direct access" to Link.  Link Decl. ¶ 45, dkt. #56.  Plaintiff says that he told her he wanted to "keep an eye on" her.  Plt.'s Dep., dkt. #39, at 260.)

Plaintiff raised concerns about the move because "employees would not have access to" her, Plt.'s Decl. ¶ 15, dkt. #96, but Link told her that he wanted her to "start focusing more on the accounting and not so much on the management."  Plt.'s Dep., dkt. #39, at 263.  In addition, Link told plaintiff that he wanted her on a more "set schedule."  (The parties dispute whether Link told plaintiff she could no longer work on weekends or past 6 p.m. on weekdays.  They also dispute whether Link discussed concerns he had about her past performance.)

On October 11, 2010, plaintiff returned to work.  She had the same salary and job title, but she no longer served as the general manager for Link Stop.  After she returned, Link stopped greeting plaintiff and her assistant when they came into work.  He often did not look up at them when they spoke to him

In November 2010 during an IRS audit, Link told plaintiff not to participate and not to tell the auditor that she was defendants' bookkeeper.


C.  Plaintiff's Second Request for Medical Leave and Return to Work

On November 22, 2010, plaintiff discovered that she was pregnant.  Her doctor

directed her to stop taking anxiety medication.  On November 25, 2010 (Thanksgiving Day), plaintiff experienced withdrawal symptoms and had to be taken to the hospital.  On Monday, November 29, plaintiff called Link to tell him that she had withdrawal symptoms and had been ordered by her doctor to remain home until December 1, 2010.  (The parties dispute whether plaintiff told Link that she was pregnant and whether Link told plaintiff that he did not care whether she was sick and that she had to return to work because she had missed too much work already.  The parties also dispute whether plaintiff tried to talk to Link on two more occasions in December and January about her pregnancy and maternity leave, but he ignored her.)  On November 30, 2010, plaintiff returned to work.

### D.  Plaintiff's Discipline and Termination

In a letter to plaintiff dated December 7, 2010 titled "Warning," Link wrote the following:

> This letter serves to warn you that unless your work performance improves to an acceptable level, further corrective action will be taken.  You have consistently been unable to meet the daily, weekly and monthly requests for me.  I urge you to make immediate improvements in your lack of communication and substandard work.

> To be realistic, I estimate that such improvement will take no time at all to become visible.  Given your excellent performance record in the past, there is no reason to assume anything but success.

During the meeting at which Link presented the letter to plaintiff, he told her that a reason for the warning was her failure to prepare financial reports on time.  Link believes that plaintiff's leave was "a factor" in the late reports.  Trans., dkt. #44, at 382. (The parties

6

dispute whether Link told plaintiff that she needed to cut down on smoke breaks.)

Link scheduled a meeting for December 15, 2010 to discuss whether Grandma Link's should be closed for part of the winter. (Plaintiff attempts to dispute this fact with her own testimony that Link already had made the decision at another meeting to close the restaurant. However, the testimony she cites shows that she does not have personal knowledge of the content of the other alleged meeting. Plt.'s Dep., dkt. #39, at 206-07.) Although plaintiff had notice of the meeting and was permitted to attend, she did not do so. Ultimately, it was Link's decision whether to close the restaurant.

By mid-December 2010, plaintiff had caught up on the "majority" of her work. Dkt. #66-23 at 10. However, she "had some outstanding questions about the Gordon Pines and Ashland assets that she needed to discuss with Jason Utrecht, Defendants' certified public accountant." Plt.'s PFOF ¶ 65, dkt. #92. On December 22, 2010, plaintiff emailed Ashland's inventory information to Utrecht "for his review and assistance." Plt.'s PFOF ¶ 92, dkt. #92  Utrecht did not respond.

On January 12, 2011, plaintiff told Link in an email that she was "waiting to hear back from Jason [Utrecht] . . . so [she] can get the correct depreciation for Ashland . . . and . . . get the remainder of the assets booked." On January 25, she told Link again that she was waiting to speak with Utrecht.

On January 24, 2011, plaintiff told Link in an email that she would be taking off January 27 and January 28, along with her boyfriend Kelly Cashman, who was also Link's employee. She wrote that "[m]y year end [reports] will be completed by Wednesday and

everything will be up to date." On January 25, Link responded in an email:

> A few days notice for two of my staff to take time off at the same time frame
> is not fair.  We have a process in place to request time off, as you know.  If
> there is some emergency, please advise.  Looking back, it seems you do not
> have any vacation time, are you requesting time off without pay?

Plaintiff wrote back later the same day:

> I do have vacation time coming . . . . I have 3 weeks . . . . I cleared Kelly's
> vacation at the store as I always have in the past with all the managers.  He
> has the store covered and there is nothing coming up over those few days that
> he needs to be there for.  Not to mention we will still be on call, like we always
> are 24/7!!! As far as my work, I am caught up with year end, month end and
> quarterlies. Ashland, I am still waiting to hear back from Jason about booking
> the assets and how he wants me to go forward with that.  Really there isn't a
> better time of the year for either of us to take 2 days off.

Link did not respond to this email.  On January 26, plaintiff submitted all year-end

financial reports to Link.  In light of Link's failure to respond, plaintiff asked Cook how she

should proceed.  Cook told plaintiff to take the days off, which is what plaintiff did.

On January 31, 2011, Link fired plaintiff, without following defendants' progressive

discipline policy.  (The parties do not say in their proposed findings of fact how Link

departed from the policy, but my own review of the policy shows that employees are to

receive at least two warnings before being terminated.)  He gave her two reasons:  (1) she

was late on her work; and (2) her attitude.  He did not provide any examples of her late work

or attitude problems and there is nothing in her personnel file about either of these issues.

(The parties dispute whether plaintiff asked Link to explain his reasons or simply left the

room.)  At the time Link fired her, plaintiff had no outstanding monthly financial reports.

### E. Medical Leave of Other Employees

Other employees of defendants, including Cook, Marilyn Lehman, Tom Ross, Nicole Reiter, Misty Mose, Linda Fosberg, Karla Gustafson and Kelle Boese, have taken medical leave and returned to work in the same position they had before taking leave.

### F. Alleged Performance Issues

Beginning in "early 2010," Link instructed plaintiff and other employees multiple times not to park behind Link Stop's back door because it blocked "emergency access" and vendor deliveries and facilitated employee theft. (The parties dispute whether plaintiff actually parked her car there and whether Link told employees not to park there because it was his spot.)  Also beginning in "early" 2010, Cook began complaining to Link about plaintiff's treatment of other employees.  In particular, she told Link that plaintiff was short-tempered, rude and condescending.

At an unspecified date, Link told plaintiff she needed to keep a regular work schedule so that "he knew when she was working and when she wasn't."  Dkt. #56 at ¶ 38.

Link required plaintiff to provide him monthly financial reports, with a deadline of the tenth of the each month.  Plaintiff did not "always" meet this deadline.  (Defendants do not say whether this occurred before plaintiff took leave.)

(The parties dispute whether plaintiff ignored Link's requests to perform certain marketing activities.)

OPINION

A.  Qualifying Employer

The first question is whether defendants qualified as an "employer" under the FMLA during all of the relevant events in this case.  The statute defines an employer as "any person . . . who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year."  29 U.S.C.A. § 2611(4)(A)(i).  Initially, the parties debated the question whether defendants collectively qualify as an "integrated employer" under 29 C.F.R. § 825.104(c) or a "joint employer" under 29 C.F.R. § 825.106 so that their number of employees could be combined in determining whether the 50-employee threshold is satisfied.  However, the parties later filed a stipulation in which they agreed that all of defendants (with the exception of Jay Link) qualified as a joint employer.  Dkt. #85.  In addition, the parties agree that defendants had at least 50 employees no later than November 2010.  However, the parties still dispute whether defendants qualified as an employer under the FMLA before that date and whether the relevant date is the employee's request for leave or the employer's alleged interference or retaliatory act.  In addition, the parties dispute the procedure for counting some employees.

The central question is one of statutory interpretation.  Plaintiff argues that, once an employer accumulates 20 weeks of employing more than 50 people between January 1 and December 31 of any given year, the FMLA applies to the employer for any actions it took during that year.  Thus, if defendants reached their 20th week in November 2010, they can

be sued under the FMLA for anything they did in any part of 2010.  Defendants argue that they cannot be held liable for any events that occurred before November 2010.

The problem with defendants' argument is that it ignores the language in the statute, which defines the relevant period as the "current . . . calendar year," 29 U.S.C.A. § 2611(4)(A)(i), the same language used in other employment statutes such as Title VII.  It is well established both in case law and in common parlance that a "calendar year" refers to the period from January 1 through December 31.  Komorowski v. Townline Mini-Mart & Restaurant, 162 F.3d 962, 965 (7th Cir. 1998) ("'[C]urrent calendar year" refers to the year in which the alleged [Title VII] violation occurred and includes the calendar year from January 1 through December 31.") (internal quotations omitted).  See also Hernandez-Miranda v. Empresas Diaz Masso, Inc., 651 F.3d 167, 171 (1st Cir. 2011); Dumas v. Town of Mount Vernon, Alabama, 612 F.2d 974, 979 n. 4 (5th Cir.1980) ; Slack v. Havens, 522 F.2d 1091, 1093 (9th Cir.1975); Cavender v. Sunbelt Rentals, Inc., 1:06-CV-664-JDT-WTL, 2007 WL 3119693 (S.D. Ind. Oct. 22, 2007) (Tinder, J.) ("'[C]urrent calendar year,' as used in the FMLA, would include the entire period between January 1 . . . and December 31 . . . regardless of when the alleged violation occurred."); Musser v. Mountain View Broad., Inc., 578 F. Supp. 229, 230 (E.D. Tenn. 1984) (in Title VII case, employer could be sued for discharge in January 1981 even though it did not have necessary number of employees until later that year); Merriam-Webster online, http://www.merriam-webster.com/dictionary/calendar%20year (defining "calendar year" as "the period of time from January 1 to December 31").  As noted by the court in

11

Komorowski, the Supreme Court made the same assumption in <u>Walters v. Metropolitan Education Enterprises, Inc.</u>, 519 U.S. 202, 205 (1997), in a Title VII case, when it referred to the current and preceding "calendar years" as "1990" and "1989."

Despite filing several briefs regarding their status as an employer, defendants never even attempt to explain how the term "calendar year" could be construed to mean only the portion of the year after the 20th qualifying week.  When a statute's language is unambiguous, the court must apply that language without considering factors such as the purpose of the statute or more general policy considerations.  <u>Morrison v. National Australia Bank Ltd.</u>, — U.S. —, 130 S. Ct. 2869, 2886 (2010); <u>United States v. Hayward</u>, 6 F.3d 1241, 1245 (7th Cir. 1993).

Instead of making an argument about the language of the statute, defendants argue that it is unfair to apply the FMLA "retroactively" to conduct that was lawful at the time that it occurred.  Although defendants' argument makes some sense, they have failed to point to any authority that would prohibit Congress from drafting the statute the way it did.

Defendants argue that it would violate the due process clause to apply the statute to conduct before November 2010, citing cases such as <u>Brown v. Entertainment Merchants Association</u>, — U.S. —, 131 S. Ct. 2729 (2011), and <u>Smith v. Goguen</u>, 415 U.S. 566 (1974), for the general proposition that statutes must give fair notice of the conduct they prohibit.  However, <u>Brown</u> and <u>Smith</u> involved statutes that imposed penalties for vague things such as "violent" and "contemptuous" conduct.  These cases are not instructive because defendants are not arguing that the FMLA is similarly vague.  Rather, as I have

discussed above, the phrase "calendar year" is unambiguous, so it puts employers on notice that the FMLA may apply to them if they employ more than 50 people for any 20 weeks between January and December.

There are constitutional limitations on Congress's power to apply a statute retroactively, Landgraf v. USI Film Products, 511 U.S. 244, 266 (1994), but defendants do not argue that any of those limitations apply in this case. In any event, as plaintiff points out, the limitations apply only to conduct that occurred before the statute was enacted. Because the FMLA was enacted long before the incidents that gave rise to this lawsuit, it is not retroactive under Landgraf.

Although defendants argue throughout their briefs that plaintiff's proposed interpretation involves a "retroactive application," they do not cite any authority in support of that view. More generally, defendants cite no cases in which a court rejected an interpretation of a statute on the ground that it made the lawfulness of particular conduct contingent on future events over which the defendant had control.

In sum, like Judge Tinder, I am "not unsympathetic to the . . . argument that requiring an employer to somehow predict whether or not it will be an FMLA 'employer' is somewhat unreasonable." Cavender, 2007 WL 3119693, at *6. However, also like Judge Tinder, I see no way to adopt defendants' view. The statute is unambiguous and defendants have not identified any reason to invalidate the statute, so I agree with plaintiff that defendants qualified as an "employer" under the FMLA for all of 2010. This conclusion makes it unnecessary to decide the exact date that defendants reached the 20th week or

13

whether defendants must qualify as an employer as of the date that plaintiff requested leave or as of the date of defendants' alleged interference or retaliation because it is undisputed that all of the relevant events occurred after January 1, 2010.

Before turning to the merits, I note that the parties' stipulation about defendants' status as a joint employer raises one question that they do not answer, which is whether Jay Link is a proper defendant in this case.  The parties stipulated that the other four defendants are plaintiff's joint employer, but the stipulation omits any mention of defendant Link, suggesting that Link is not properly classified as plaintiff's employer.  Accordingly, I will direct the parties to show cause why Link should not be dismissed from the case.

## B.  Merits

### 1.  Types of FMLA discrimination

Plaintiff says that defendants violated three provisions in the FMLA.  First, under 29 U.S.C. § 2614, after an employee returns from leave, the employer must give her the same position she held previously or a position that is "equivalent" in "benefits, pay, and other terms and conditions of employment."  Second, under 29 U.S.C. § 2615(a)(1), an employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise" an employee's right to take leave.  Third, under 29 U.S.C. § 2615(a)(2), an employer may not "discriminate against any individual for opposing any practice" prohibited by the FMLA.

Plaintiff says that defendants violated § 2614 by refusing to allow her to come back to work for two weeks after her doctor released her to work.  In addition, she says that, when

14

she did return, defendants did not give her the same or "equivalent" position because they changed her conditions of employment in various ways.  Plaintiff says that defendants violated § 2615(a)(1) by refusing her second request for leave and by terminating her "to avoid providing her maternity leave."  Plt.'s Br., dkt. #90, at 52.  Finally, plaintiff says that defendants violated § 2615(a)(2) for taking all of the actions that violated § 2614 and § 2615(a)(1).

Section 2615(a)(2) is not at issue in this case.  That section prohibits retaliation for "opposing" conduct that is prohibited by the FMLA, just as Title VII prohibits retaliation for "opposing" unlawful employment practices.  42 U.S.C. § 2000e–3(a).  Opposition includes things such as filing grievances or making statements against unlawful conduct. Crawford v. Metropolitan Government of Nashville and Davidson County, Tennessee, 555 U.S. 271 (2009); Loudermilk v. Best Pallet Co., LLC, 636 F.3d 312, 315-16 (7th Cir. 2011). Plaintiff does not say that she "opposed" any unlawful conduct.  Rather, she alleges that defendants retaliated against her for taking leave.  In that context, retaliation is just another form of interference under § 2615(a)(1).  29 C.F.R. § 825.220 ("The Act's *prohibition against interference* prohibits an employer from . . . retaliating against an employee . . . for having exercised or attempted to exercise FMLA rights. . . . [E]mployers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions.") (emphasis added); Simpson v. Office of Chief Judge of Circuit Court of Will County, 559 F.3d 706, 712 (7th Cir. 2009) ("Firing an employee to prevent her from exercising her right to return to her prior position can certainly interfere with that

15

employee's FMLA rights.").  Accordingly, I will first consider plaintiff's claim under § 2614 and then consider whether plaintiff has adduced sufficient evidence that any of the adverse acts she has identified qualify as interference under § 2615(a)(1).


2.  Delayed reinstatement

Defendants do not deny that they prohibited plaintiff from returning to work for two weeks after she said she was ready to come back and they say little about plaintiff's claim under § 2614 in their briefs.  Their only argument devoted expressly to that claim is that they were not an "an employer" under the FMLA at the time that plaintiff wanted to come back to work, but I have already rejected that argument.

In the context of plaintiff's retaliation claims, defendants include a section that they call "failure to allow Arrigo back to work on September 27th is not a material[ly] adverse action."  Dfts.' Br., dkt. #54, at 20.  The phrase "materially adverse action" does not appear anywhere in the FMLA, but courts applying the FMLA have borrowed the term from case law involving discrimination and retaliation claims brought under Title VII.  E.g., Breneisen v. Motorola, Inc., 512 F.3d 972, 981-82 (7th Cir. 2008).  Although the parties do not cite any cases in which the court of appeals has considered whether § 2614 includes a "materially adverse" element, I conclude that it does.  In Title VII cases, the "materially adverse" requirement is a judicial gloss on the phrase "compensation, terms, conditions, or privileges of employment."  42 U.S.C. § 2000e-2(a); Minor v. Centocor, Inc., 457 F.3d 632, 634 (7th Cir. 2006) (term "adverse employment action" is "essential to distinguish between

16

material differences and the many day-to-day travails and disappointments that, although frustrating, are not so central to the employment relation that they amount to discriminatory terms and conditions"). Because § 2614 includes similar language about changes to the "terms and conditions of employment," it makes sense to apply the same requirement to that statute.

Defendants argue that the delay was not materially adverse because plaintiff was paid for the two weeks that she was not allowed to come back to work.  Although loss of pay is one way to show a materially adverse action, e.g., Lewis v. City of Chicago, 496 F.3d 645, 654 (7th Cir. 2007), it is certainly not the only way.  In this case, plaintiff says that the delay made it more difficult for her to catch up on her work. Particularly because an inability to finish work on time is one of the reasons defendants cite for firing plaintiff, I cannot accept defendants' argument that the delay did not harm her.

In the same section of their brief, defendants say that "it is not unreasonable for an owner of the business to want to visit with his bookkeeper to ensure that she is okay to return to handling the businesses' financial matters."  Dkt. #54 at 20.  This is not an argument about whether the delay was materially adverse; rather, it is an argument whether the FMLA permitted Link to delay plaintiff's return because of  his own concerns about her mental health.

Surprisingly, neither side cites James v. Hyatt Regency Chicago, 707 F.3d 775, 780-81 (7th Cir. 2013), a recent case in which the court of appeals considered a similar issue. In James, the question was whether the employer violated the FMLA when it failed to

17

reinstate an employee after he gave the employer a note from his doctor, releasing him to "light duty" work.  The court found no violation because the FMLA does not require an employer to return an employee to work if the employee cannot perform the essential functions of her job.  <u>Id.</u> at 781 (citing 29 C.F.R. § 825.214(b)).  However, before reaching that conclusion, the court considered another case cited by the plaintiff, <u>Brumbalough v. Camelot</u>, 427 F.3d 996 (6th Cir. 2005), in which the court held "that once an employee submits a statement from her health care provider which indicates that she may return to work, the employer's duty to reinstate her has been triggered under the FMLA."  Without further discussion, the Court of Appeals for Seventh Circuit stated that it "agree[s] with the holding in" <u>Brumbalough</u>.

<u>Brumbalough</u> is not directly on point because plaintiff did not provide defendants a release from her doctor; rather, she simply told Link that she had one.  However, it is undisputed that defendants did not *ask* her for a release.  Although defendant Link says that he was concerned in part because he had not seen an authorization from plaintiff's doctor, Link does not say that he ever asked to see any documentation from her doctor, even when he later met with plaintiff on October 8, 2010.  I read <u>Brumbalough</u>, <u>James</u> and the regulations relating to the employee's return to work as allowing an employer to seek proof from the employee's health care provider that she is able to perform all the essential functions of her job, but prohibiting the employer from determining unilaterally when the employee is ready to come back.  29 C.F.R. § 825.312(b) (employee may contact health care provider regarding employee's fitness for duty, but "[t]he employer may not delay the

18

employee's return to work while contact with the health care provider is being made"). Accordingly, I conclude that defendants are not entitled to summary judgment on this claim.

In her brief in opposition to defendants' motion for summary judgment, plaintiff says that *she* is entitled to summary judgment on this claim, dkt. #90 at 49, but she did not include that claim in her own motion for partial summary judgment. Generally, courts may not grant summary judgment on a claim if the party did not provide notice by filing a motion. Cloe v. City of Indianapolis, 712 F.3d 1171, 1182-83 (7th Cir. 2013). However, it is pointless to try a claim if there are no genuine issues of material of fact. Accordingly, I will give defendants an opportunity to show cause why the court should not grant summary judgment to plaintiff on her claim that defendants violated § 2614 by delaying her return to work.

### 3. Changes to plaintiff's job after her return to work

The next question is whether defendants failed to provide plaintiff the same or equivalent job when she returned to work, as required by § 2614. Although plaintiff had the same pay and job title when she returned, she argues that the job was not "equivalent" because defendant Link took away her management responsibilities, excluded her from management decisions, moved her office, restricted her schedule, kept a "closer eye" on her and often refused to speak to her or "loo[k] her in the eye." Plt.'s Br., dkt. #90, at 49.

It is well established that a reduction in job responsibilities may qualify as a materially adverse action, e.g., Tart v. Illinois Power Co., 366 F.3d 461, 473 (7th Cir. 2004); Crady v.

Liberty National Bank & Trust Co., 993 F.2d 132, 136 (7th Cir. 1993), so plaintiff's loss of management responsibilities could be sufficient in itself to show that she was not returned to an equivalent job.   Defendants argue for the first time in their reply brief that bookkeeping was plaintiff's "core" responsibility and her managing duties were "peripheral." Dkt. #115 at 13.   Although defendants are correct that a change in responsibilities must be "significant" to qualify as materially adverse, Stephens v. Erickson, 569 F.3d 779, 790 (7th Cir. 2009), they cite no authority for their "core-peripheral" distinction.   Regardless what plaintiff's primary duties were, it is undisputed that she was the general manager of Link Stop before she took leave and was no longer the general manager when she returned, which seems like a significant loss.   In any event, defendants forfeited this argument for the purpose of summary judgment by failing to raise it in their opening brief.   Costello v. Grundon, 625 F.3d 342, 363 (7th Cir. 2010).   The same goes for defendants' argument that it limited plaintiffs' duties at her own request, an issue that defendants did not raise in their opening brief or in any of their proposed findings of fact.

The other treatment that plaintiff complains about might not be sufficient on its own to qualify as a change in her terms and conditions of employment, but it is not necessary for plaintiff to make that showing because I have concluded for the purpose of summary judgment that the reduction in job responsibilities is sufficient.   Thus, other changes plaintiff experienced, even small ones, may be considered collectively with the reduction in responsibilities as additional factors showing that defendants did not provide an equivalent job when she returned to work. Cf. Bart v. Telford, 677 F.2d 622, 625 (7th Cir. 1982)

20

("campaign of petty harassment" may be sufficiently adverse when considered collectively).

However, I will dismiss plaintiff's claim with respect to her allegations that defendant Link moved her office, excluded her from management decisions and kept a "closer eye" on her because plaintiff has not shown that those events had *any* adverse effect on her. With respect to the office move, plaintiff does not identify how it affected her job adversely, with the exception that it took her away from her management responsibilities. Because plaintiff has raised that issue separately, plaintiff cannot point to the change in location as its own adverse action. With respect to Link's alleged closer scrutiny, plaintiff has not identified any examples that would allow me to determine whether there was an adverse effect on her terms and conditions of employment.

With respect to her exclusion from management decisions, plaintiff points to two incidents. First, she says that defendant Link did not consult her on the decision whether to close Grandma Link's restaurant for the winter. However, she admits that she chose not to attend the meeting in which Link discussed that decision with staff. Although she says that Link had made his decision before that meeting, her deposition testimony shows that she has no foundation for that belief. Second, she says that defendant Link did not allow her to participate in an IRS audit, but she does not explain why that decision should be viewed as having an adverse effect on her job.

The court of appeals has sometimes stated that a claim under § 2614 does not include an intent requirement, e.g., Goelzer v. Sheboygan County, Wisconsin, 604 F.3d 987, 995 (7th Cir. 2010), but this is misleading because the court has also said that the FMLA does

not give an employee the right to prevent an employer from changing aspects of her job for reasons that are not related to her taking leave.  Scruggs v. Carrier Corp., 688 F.3d 821, 825-26 (7th Cir. 2012) ("[A]n employee has 'no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed.'") (quoting 29 C.F.R. § 825.216(a)).  As a result, it will be impossible in many cases to determine whether an employer violated § 2614 without also determining the employer's motivation for acting as it did.

In this case, the only argument defendants develop regarding its reasons for making changes to plaintiff's job duties is their forfeited argument that plaintiff asked them to reduce her responsibilities. Accordingly, this aspect of plaintiff's claim under § 2614 must proceed to trial.

Some of plaintiff's interference claims under § 2615(a)(1) overlap with her claims under § 2614.  For example, she alleges that defendants reduced her responsibilities and took the other adverse actions discussed above because she exercised her right to take leave.  In addition, she alleges that Link retaliated against her for taking leave by giving her a disciplinary warning in December 2010 and requiring her to answer "personal and inappropriate" questions before allowing her to return in October 2010.  Defendants argue again that these actions are not materially adverse.  Although I agree that a disciplinary warning or an intrusive conversation would not be sufficient by itself to sustain an interference claim, again, I see no reason to exclude these smaller incidents of alleged interference from the alleged campaign of harassment that plaintiff says she experienced after

22

returning to work.  Because defendants do not develop an argument about their motivation for taking these actions, I am denying defendants' motion for summary judgment as to these claims of interference.


4.  Second request for leave

Plaintiff contends that defendants interfered with her FMLA rights under § 2615(a)(1) by denying her November 2010 request for leave while she was suffering from withdrawal symptoms as a result of discontinuing her anxiety medication.  It is genuinely disputed whether defendants refused to approve that leave, so that issue will have to be resolved by the jury.

Defendants argue for the first time in their reply brief that plaintiff has not proven that her medication withdrawal was a "serious health condition" under the FMLA, so she was not entitled to take leave.  29 U.S.C. § 2612(a)(1)(D) (employee may take leave under FMLA for a "a serious health condition that makes the employee unable to perform the functions of the position of such employee").  However, plaintiff was not required to present evidence on this issue when defendants did not raise it in their opening brief.  Arguments raised in a reply brief are waived for the purpose of summary judgment.  Costello, 625 F.3d at 363.  Accordingly, this claim must proceed to trial as well.


5.  Termination

With respect to plaintiff's termination, the only question defendants raise is whether

23

she has adduced sufficient evidence to show that she was terminated because she had taken medical leave or because she was going to take maternity leave. (It is undisputed that maternity leave is protected under the FMLA. 29 U.S.C. § 2612(a)(1)(A).)  Because I conclude that plaintiff has raised a genuine issue of material fact on this issue, I am denying defendants' motion for summary judgment on this claim.

Perhaps the strongest piece of evidence in plaintiff's favor is her testimony regarding defendant Link's response when she told him that she was pregnant in November 2010 and needed to take leave.  According to plaintiff, Link told plaintiff that "He didn't care, that [she] had missed enough work and that [she] needed to come back to work immediately."  Plt.'s Dep., dkt. #39, at 321.  It is reasonable to infer from this statement that Link was hostile to the idea of plaintiff taking leave, even if it was for a reason protected by the FMLA.  Particularly because plaintiff's leave request in November was for only a few days, such a strong and negative reaction by Link suggests he could react even more strongly to a longer request for maternity leave.

Second, plaintiff testified that Link refused to talk about her pregnancy or maternity leave when she tried to bring it up again later, which is further evidence that Link did not want to give plaintiff leave for her pregnancy . Id. at 325-26.  Although Link denies that he learned about plaintiff's pregnancy before she was terminated, I must accept plaintiff's version of events as true for the purpose of summary judgment.  Kodish v. Oakbrook Terrace Fire Protection District, 604 F.3d 490, 502 (7th Cir. 2010).

Third, Link fired plaintiff immediately after she took two days off in January 2011.

Although plaintiff does not contend that those days were medical leave protected by the FMLA, Link's reaction is evidence of a general negative attitude toward plaintiff's taking leave for any reason.   More generally, both plaintiff's disciplinary warning and her termination came shortly after plaintiff took medical leave and says she informed Link about her pregnancy and needed to take maternity leave.  That suspicious timing is additional evidence of defendants' intent.   Loudermilk, 636 F.3d at 315.

Defendants argue that they fired plaintiff for "poor performance," but a reasonable jury could find that their explanations are pretextual.  When Link fired plaintiff, the only two reasons he cited were her attitude and her delay in completing her work.  With respect to late work, defendant Link admits that he believes that plaintiff's medical leave was part of the reason she fell behind, so it is difficult to untangle concerns about productivity from resentment for exercising FMLA rights.  That type of weighing the evidence is the province of the jury, not the court.  Dowden v. Polymer Raymond, Inc., 966 F.2d 1206, 1207 (7th Cir. 1992) ("Summary judgment is not an appropriate occasion for weighing the evidence, and should not be granted if the evidence supports alternate inferences.").   Further, defendants do not identify any work that was late at the time Link fired plaintiff, which undermines this reason.  Plaintiff acknowledges that there was one project regarding Ashland's assets on which she was still working, but it is undisputed that the reason for the delay was that plaintiff was waiting for information from another employee.  Although plaintiff kept defendant Link apprised of the situation, he never indicated that he believed that she should be doing something more than she was already doing.

25

With respect to plaintiff's attitude, a jury could reject that reason because defendants cite no evidence that they ever had told her that her attitude was a problem, even though Link now says that the problems began in "early" 2010.  Peirick v. Indiana University-Purdue University Indianapolis Athletics Dept., 510 F.3d 681, 692 (7th Cir. 2007) (employer's failure to notify employee of problem is evidence of pretext); Ajayi v. Aramark Business Services, Inc., 336 F.3d 520 (7th Cir. 2003) (employer's failure to take action on complaints against employee supports finding of pretext).  Plaintiff says that Link was unable to provide any examples of an attitude problem, even on the day he fired her.

In their summary judgment materials, defendants offer numerous examples of plaintiff's allegedly poor performance, but none of these can carry the day for them.  Some of the reasons, such as plaintiff's refusal to conduct certain marketing activities,  parking in the wrong spot and coming into work late or leaving early, rely on genuinely disputed facts, so they must be resolved by a jury.  Some reasons are so vague that it is impossible to tell whether they have any basis in fact.  E.g., Dfts.' PFOF ¶ 75, dkt. #55 ("Link became increasingly concerned and frustrated with Arrigo's performance by early 2010."); id. at ¶ 110 ("Arrigo's performance problems continued after the move to the Bond Lake office."). Similarly, other reasons are nothing more than statements of Link's "belief" about plaintiff's performance without identifying examples or any basis for the belief.  E.g., id. at ¶ 85 ("Link also believed Arrigo tended to show favoritism to employees that were her friends."); id. at ¶ 86 ("Link also believed Arrigo was unwilling to 'chip in' to help with various tasks as needed.").  "Where an employer's reason for a termination is without factual basis . . ., that

is evidence that an employer might be lying about its true motivation," Hobgood v. Illinois Gaming Board, 722 F.3d 1030, 1040 (7th Cir. 2013). All of the other reasons, such as inaccuracies in plaintiff's bookkeeping and failure to pay bills, cannot serve as the basis for summary judgment because there is no evidence that defendants identified those reasons before plaintiff accused them of discriminating against her. Fischer v. Avanade, Inc., 519 F.3d 393, 407 (7th Cir. 2008).

It is not clear whether defendants are arguing now that plaintiff's decision to take off two days in January was a ground for terminating her. Defendants do not discuss the incident in their briefs, but Link says in his declaration that it was the "final straw." Dkt. #56 at ¶ 56. However, Link does not refute plaintiff's representation that she was owed three weeks of vacation time when she requested leave and he does not say that he prohibited her from taking the leave. Rather, he says that plaintiff "knew [that] all employees were supposed to provide at least two weeks written notice before taking time off for work." Id. However, Link did not testify that he told plaintiff she needed to provide two weeks' written notice or that he ever had required her to do that in the past. Rather, he testified in his deposition that he and plaintiff had an informal process in which she could request time off orally. Dkt. #51 at 209-10. He did not specify a time frame. Thus, there is at least a dispute whether plaintiff violated any company rules by taking leave when she did.

In any event, even if I assume that plaintiff was required to give more notice, it is undisputed that Link's decision to fire her was inconsistent with defendants' own progressive

disciplinary policy.  <u>Rudin v. Lincoln Land Community College</u>, 420 F.3d 712, 727 (7th Cir. 2005) ("[A]n employer's failure to follow its own internal employment procedures can constitute evidence of pretext.").   Particularly because plaintiff had been working for defendants for so many years without incident before she took leave, defendants' abrupt firing of her supports the drawing of an inference that defendants were motivated by plaintiff's requests for FMLA leave.  <u>Valentino v. Village of South Chicago Heights</u>, 575 F.3d 664, 673-74 (7th Cir. 2009) (summary judgment inappropriate when "termination occurred without warning after nearly fifteen years of uninterrupted service").

Finally, defendants point to several employees who took medical leave but were not fired.  Although evidence that the employer did not discriminate against other employees who exercised their rights may be a relevant fact for trial, it does not require summary judgment in defendants' favor.  <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 153 (2000) (in age discrimination case, fact "that respondent employed many managers over age 50—although relevant, is certainly not dispositive").   Particularly because defendants make no showing that the other employees' leave requests were similar to plaintiff's, this evidence is not enough to defeat plaintiff's claim as a matter of law.


C.   <u>Motion for Leave to File Amended Answer</u>

Under 29 U.S.C. § 2617(a)(1)(a)(iii), a plaintiff may recover liquidated damages for violations of § 2615 unless the defendant "proves to the satisfaction of the court that the act or omission which violated section 2615 of this title was in good faith and that the employer

had reasonable grounds for believing that the act or omission was not a violation of section 2615." In their original answers, the defendants denied plaintiff's allegation that "[d]efendants' violations of 29 U.S.C. § 2615 were not in good faith, and [d]efendants did not have reasonable grounds for believing that their conduct did not violate 29 U.S.C. § 2615." Cpt. ¶ 56, dkt. #1. Defendants now seek to amend their answers to include an affirmative defense that "all actions challenged by Plaintiff were taken in good faith and with reasonable grounds for believing that the actions did not violate the FMLA."

It is questionable whether it is necessary for defendants to amend their answer simply to reallege in the affirmative what they already denied. Regardless, I see no reason to deny defendants' request because there is no unfair prejudice to plaintiff. By denying plaintiff's allegations in their answers, defendants put plaintiff on notice of their position that they acted in good faith. Fair notice is all that the federal rules require. Fed. R. Civ. P. 8(a)(2). Although it would have been more precise for defendants to expressly identify good faith as an affirmative defense, the Supreme Court long ago "reject[ed] the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome." Conley v. Gibson, 355 U.S. 41, 48 (1957). See also Rabe v. United Air Lines, Inc., 636 F.3d 866, 872 (7th Cir. 2011) ("[S]pecifying an incorrect legal theory is not a fatal error" under federal pleading rules.). Plaintiff opposes defendants' motion, but she does not even attempt to explain why defendant's denial was not adequate to put her on notice that the issue of good faith was in dispute.

Plaintiff says that allowing defendants to amend their answer will "caus[e] her to

29

incur additional discovery costs," Plt.'s Br., dkt. #112, at 6, but that argument is a nonstarter because it assumes that plaintiff did not have adequate notice of the defense. In any event, plaintiff does not identify what additional discovery she will have to do. The issue of good faith likely overlaps substantially with the issue whether defendants acted with a retaliatory motive, an issue the parties addressed in depth in their summary judgment submissions.

Plaintiff also says that she will be prejudiced because she will not have an opportunity to seek summary judgment on the question of good faith, but that argument is disingenuous. Neither party sought summary judgment on any damages issue and plaintiff does not explain why this issue would be any different. Even if plaintiff had included the issue in her motion, she could not have prevailed on it. Because defendant Link has denied any intent to discriminate or retaliate against plaintiff, the issue of good faith is not one that could be resolved on summary judgment.


ORDER

IT IS ORDERED that

1. Plaintiff Marylee Arrigo's motion for partial summary judgment on the issue whether defendants Link Stop, Inc., Jay E. Link, Ashland Lake Superior Lodge, LLC, Grandma Link's Restaurant and Lounge, LLC and Gordon Pines Golf Course qualify as an employer under the Family and Medical Leave Act, dkt. #62, is GRANTED with respect to defendants Link Stop, Ashland Lake Superior Lodge, Grandma Link's Restaurant and

Lounge and Gordon Pines Golf Course.  The motion is DENIED as to Jay Link.

2. Defendants' motion for summary judgment, dkt. #53, is GRANTED with respect to plaintiff's claims under 29 U.S.C. § 3615(a)(2) and plaintiff's claims that defendants violated her rights by moving her office, excluding her from management decisions and keeping a "closer eye" on her.  In all other respects, the motion is DENIED.

3.  Defendants' motions for leave to file an amended answer and to file a reply brief in support of that motion, dkt. ##107 and 122, are GRANTED.

4.  The parties may have until  October 21, 2013, to show cause why defendant Jay Link should not be dismissed from the case.

5.  Defendants may have until October 21, 2013, to show cause why summary judgment should not be granted to plaintiff on her claim that defendants violated 29 U.S.C. § 2614 by delaying her return to work by two weeks.

Entered this 4th day of October, 2013.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

31